UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-60886-RAR

**PAUL SINCLAIR**, on behalf of himself
and all others similarly situated,

    Plaintiff,

v.

**WIRELESS ADVOCATES, LLC**,

    Defendant.
_____/

## ORDER GRANTING MOTION TO COMPEL ARBITRATION

This matter is before the Court following a bench trial conducted on February 3, 2021, on the limited issue of whether Plaintiff agreed to arbitration, which requires determination by the Court pursuant to 9 U.S.C. § 4. The Court previously ruled that Plaintiff presented an issue of fact as to whether he electronically acknowledged a dispute resolution agreement requiring him to arbitrate his claim for unpaid overtime under the Fair Labor Standards Act ("FLSA"). The Court has now conducted a bench trial and issues the following findings of fact and conclusions of law.[1] Further, the Court has considered the arguments and evidence presented at the bench trial, all supporting and opposing submissions, the record and applicable law, and is otherwise fully advised. For the reasons set forth herein, it is hereby

**ORDERED AND ADJUDGED** that the Court *sua sponte* reconsiders its Order [ECF No. 84] and **GRANTS** Defendant's Motion to Compel Arbitration and to Stay Proceedings Pending Arbitration [ECF No. 22] ("Motion").

---

[1] To the extent that any findings of fact constitute conclusions of law, they are hereby adopted as such; to the extent that any conclusions of law constitute findings of fact, they are also so adopted.

## BACKGROUND

Plaintiff Paul Sinclair, through this FLSA collective action, seeks damages from Defendant Wireless Advocates, LLC ("Wireless Advocates") for its alleged failure to pay him, and other similarly situated individuals, overtime wages. In response to this lawsuit, Wireless Advocates filed a motion seeking to compel arbitration and stay the case based on Mr. Sinclair's execution of an employee dispute resolution agreement requiring arbitration of all claims. Def.'s Mot. [ECF No. 22] at 1-2. In opposing the Motion, Mr. Sinclair denied ever signing an arbitration agreement or otherwise agreeing to arbitrate any claims against Wireless Advocates. Pl.'s Resp. [ECF No. 36]. In light of the parties' factual disagreement, the Court determined Mr. Sinclair raised a genuine issue of material fact concerning the formation of the purported arbitration agreement and denied Defendant's Motion, without prejudice pending a jury trial on the limited issue of whether Plaintiff entered into the alleged agreement requiring arbitration. Order [ECF No. 84]. Following a status conference with the parties, the Court set this matter for a bench trial on the sole issue of contract formation.[2] Order [ECF No. 95].

On February 3, 2021, the Court held a one-day bench trial [ECF No. 110]. Prior to the trial, the parties submitted a Joint Pretrial Stipulation [ECF No. 105], as well as their proposed findings of fact and conclusions of law [ECF Nos. 106, 107]. The Court has carefully reviewed these submissions. The Court also paid close attention to the testimony and evidence presented during the trial. After carefully considering the testimony and evidence, and the applicable law, the Court finds that Mr. Sinclair did complete the Mutual Binding Arbitration Agreement Module ("Arbitration Module") and its associated electronic acknowledgment, thus establishing the

---

[2] Although Plaintiff was entitled to a jury trial, he agreed to proceed with a bench trial in light of the ongoing suspension of jury trials due to the COVID-19 pandemic. *See* Administrative Order 2020-76 (Seventh Order Concerning Jury Trials and Other Proceedings).

formation of a contract to arbitrate. Therefore, the Defendant's Motion is granted, and the parties shall submit all claims asserted in the Complaint to arbitration.

## SUMMARY OF TESTIMONY

### A. Daniel Regard[3]

Daniel Regard was called as an expert witness by Defendant.[4] Mr. Regard is an electronic technology specialist with more than twenty years of experience advising on electronic discovery, computer forensics, database development, and application software and data analysis. He was retained by Wireless Advocates to provide an analysis and opinion regarding Mr. Sinclair's completion of the Arbitration Module and the reliability of Wireless Advocates' multiple data sources confirming the same.

Mr. Regard reviewed several materials in order to prepare his Report, including, but not limited to, the pleadings, witness declarations, several Training Tracker Status Reports ("TTSRs") for selected dates, and the Wireless Advocates Employee Handbook (dated March 6, 2014). *See* Report [ECF No. 113-3] at 12. Mr. Regard testified that multiple data sources show that a user logged in as Paul Sinclair completed the course work related to "Employee Handbook Acknowledgement – 2014" on June 28, 2014, and "Arbitration Policy Attestation for Outside of CA" on April 20, 2015. *Id.* at 4.

Mr. Regard reviewed several contemporaneously generated reports in order to form an opinion as to the function and reliability of the Wireless Advocates University ("WAU") learning management system. Those system reports—or TTSRs—are generated as Microsoft Excel (.XLS)

---

[3] Mr. Regard's testimony was very thorough and covered several topics. The summary that follows selectively addresses what the Court has deemed to be the most relevant parts of Mr. Regard's testimony for purposes of the analysis set forth in this Order.

[4] Mr. Regard's extensive CV was attached as Exhibit A to his report in this matter. *See* Report of Daniel L. Regard II ("Report"), Ex. J-11 [ECF No. 113-3].

spreadsheets and they are broken down by region, district, location, individual employee, and WAU module. The TTSRs Mr. Regard reviewed contain detailed records of the training modules that were administered through the WAU system in 2014 and 2015. Specifically, they contain the training records for all Wireless Advocate employees and can be sorted by location or individual employee. Wireless Advocates uses these TTSRs to audit the training completion status for each employee and each module. For example, the TTSR spreadsheets use the following designations to indicate the status of a particular module:



*See* Report [ECF No. 113-3] at 12.[5] These designations provide digital forensic evidence that shows Wireless Advocates not only had a method of tracking when an entire training module was successfully completed, but also if particular modules were assigned; if employees were excluded; when modules were started but not finished; or when completion conditions were not sufficiently met. Based on his review of the record and evidence, Mr. Regard testified that the data Wireless Advocates stored (including the TTSRs) was labeled, reported, and relied upon in a way that provided sufficient indicia of its timeliness, accuracy, and reliability.

As part of his review, Mr. Regard analyzed TTSRs containing training records for all sales employees and managers, and an overall summary for each kiosk including the Location 91

---

[5] A cell containing a date of completion highlighted in green means the module was completed on the date noted.

kiosk—which was the kiosk Mr. Sinclair managed. These records, evidenced by multiple reports generated in April and May 2015, included the completion status corresponding to the Arbitration Module for every employee associated with Location 91. Collectively, the data with respect to the team at Location 91 shows that the Arbitration Module: (a) was assigned no later than April 13, 2015; (b) had not been completed by any of the assigned employees by April 17, 2015; (c) had been completed by sixty-six percent (66%) of the assigned employees by the morning of April 24, 2015; and (d) had been completed by all assigned employees by the end of April 24, 2015. This includes completion of the arbitration module by Mr. Sinclair as evidenced by the following TTSR generated on May 1, 2015 at 8:00 A.M.:

| | | | | | | Min | 4/13/15 |
|---|---|---|---|---|---|---|---|
| Category: | | | | | | | Arbitration Ack 4/1/2015-- Normal |
| Region | District | Location | Emp Num | Student Name | Hire Date | Position | Wireless Advocates Policies and Procedures<br><br>Arbitration Policy Attestation for Outside of CA |
| SE Region | SE1 | 91 | | | 10/13/14 | W1WE | 4/24/15 |
| SE Region | SE1 | 91 | PS111101 | Paul Sinclair | 10/18/10 | W1KM | 4/20/15 |
| SE Region | SE1 | 91 | | | 1/16/15 | W1WE | 4/23/15 |

*See* Report [ECF No. 113-3] at 33-34.

Mr. Regard found Wireless Advocates' records to be reliable. As he explained, he compared several TTSRs generated on different dates and the reports were consistent across the board and appeared to build on each other. Through the examination of almost 2,000 entries from report to report, he found that the status designations progressed from assigned; to in progress; to completed or failed; and then completed—all in a forward progression. Additionally, with the exception of extraordinarily rare occasions, the designations never regressed—which Mr. Regard interpreted as indicative that the information was accurately captured and maintained.[6] In Mr.

---

[6] Mr. Regard also clarified that while the module completion dates do not change, the module descriptions may change depending on when a specific TTSR is generated. This would explain why column X on the

Regard's opinion, the ability to look at these records over time is extremely informative as to the reliability and accuracy of Wireless Advocates' system.

### B. Paul Sinclair

Paul Sinclair was called as a witness by Plaintiff. Mr. Sinclair was employed by Wireless Advocates from October 2010 through July 2017. He was a Kiosk Manager throughout his time with the company. He started working as a Kiosk Manager at the Boca Raton kiosk (Location #345) and in 2011 he was transferred to the Davie kiosk (Location #91). He was generally assigned a specific Wireless Advocates location, but he also floated between different locations whenever a District Manager needed help or if another Kiosk Manager needed coverage.

Mr. Sinclair testified that many key resources relating to his employment could be accessed by logging on to the WAU system using his credentials—his store number and employee ID. The WAU system was useful in many ways; for example, it included information regarding Wireless Advocates' terms of employment, the employee manual, and online training modules (including online GUESTS training).[7]

As a Kiosk Manager, Mr. Sinclair was responsible for overseeing that all new employees on his team completed their onboarding process on WAU. Mr. Sinclair testified that this involved directing employees to the correct resources on WAU and being available as questions arose, but employees were ultimately required to complete the training themselves. The WAU system would

---

spreadsheet attached as Exhibit C to the Declaration of Krishawn Smith [ECF No. 22-1] is titled "Wireless Advocates Policies and Procedures Arbitration Outside of California –**2016**," even though Mr. Sinclair completed the Arbitration Module on April 20, 2015. In other words, because there is only one module completion cell correlated to one module description cell, the module description may change to reflect different calendar years, but any such changes in the module description entry would not affect a previously existing module completion entry.

[7] GUESTS is an acronym coined by the founder and CEO of Wireless Advocates. The GUESTS program is a process aimed at teaching a series of sales techniques.

automatically track training completion. Mr. Sinclair would receive completion reports from his District Manager and review the same to ensure that his team was current on their training.

With regards to his own completion of the training modules on WAU, Mr. Sinclair's responses were inconsistent. For example, initially, Mr. Sinclair agreed that he completed the required GUESTS trainings on WAU. Later, Mr. Sinclair was shown a TTSR—and he confirmed that his name, kiosk location, and date of hire were listed correctly. However, when he was asked whether the list of GUESTS trainings reflected on the TTSR were training modules that he had completed, Mr. Sinclair back tracked and stated he did not remember taking the specific trainings on the TTSR spreadsheet he was being shown.

He further elaborated that there have been situations where District Managers have taken trainings for employees without the employees' knowledge. He reiterated that sometimes "District Managers could access your information and they could go in and if they wanted to, knock out trainings for you and you not know it…."[8] However, when asked whether he was aware of that situation ever occurring to him with respect to his own trainings, Mr. Sinclair answered "[a]gain, nobody took my training for me. But you do have District Managers who are under a timeline. If you're not at the kiosk or you're off—you're on vacation, sometimes District Managers have been known to have gone and done stuff like that." Notably, when asked whether it is possible that he took the trainings but does not explicitly remember doing so, Mr. Sinclair answered "correct."

Next, Mr. Sinclair was asked whether he had completed the Arbitration Module. He answered that he had not. When asked how he could be so sure that he did not complete the Arbitration Module, Mr. Sinclair responded "[w]ell, that I would've recalled especially because we've talked about it and that's one of the things I was telling you that's a possibility that District

---

[8] Although the Court does not have an official transcript, it has reviewed the audio recording of the bench trial in order to ensure that all quotes are verbatim.

Managers they go in and some of these trainings could be redundant so they do go in there and clear them out…so I don't know if that was done in my situation and I didn't have to do it or I didn't receive it." When asked by counsel whether he brought up this issue of District Managers taking trainings for employees during his deposition in January 2021, Mr. Sinclair responded, "[n]o. I thought you knew."

### C. Krishawn Smith

Krishawn Smith was called as a witness by Defendant. Mr. Smith is currently the Learning and Development ("L & D") Operations Manager at Wireless Advocates, and he has held that position since approximately 2019. Previously, he was the Learning Management System ("LMS") and Social Media Manager for the company between late 2016 and 2019. Prior to that, he was a Learning Content Developer within Wireless Advocates' L & D group from 2010 to 2016.

In his current position, Mr. Smith is responsible for managing the LMS team, as well as general operations for the Wireless Advocate training programs and the various creative aspects of training system resources. In 2016, Litmos replaced the WAU learning system. Most recently, in August 2018, the Litmos system was replaced by a new learning system called Cornerstone. All three systems—WAU, Litmos, and Cornerstone—are "learning systems." A learning system is a platform that a company can use to load training related materials for end-users (employees) to complete required or optional training as a function of their job.

Wireless Advocates uses learning systems to make training and acknowledgment modules available to its employees. These training and acknowledgment modules are often applicable to— and must therefore be completed by—both general sales employees and managers. When an employee logs on to a LMS such as WAU, the system populates a list of required training modules.

This is called the employee's "learning curriculum." A module stays on an employee's learning curriculum until it is completed.

One of the many modules developed by Wireless Advocates was the Arbitration Module. *See* Ex. J-5 [ECF No. 113-1]. Mr. Smith did not create the Arbitration Module. However, due to his experience as a former content creator for Wireless Advocates, he understands how the Arbitration Module functioned at the time it was assigned on the WAU system. All employees were required to complete the Arbitration Module. In order to access the Arbitration Module, an employee would have had to log in to WAU using their initials and assigned employee number. Once an employee inputs their credentials, they are granted access to complete the Arbitration Module. The Arbitration Module's initial slides explain that it is an acknowledgement module (as opposed to a training module) and further warns that employees should not complete the acknowledgment for someone other than themselves. *Id*. at 5. Mr. Smith testified that it is Wireless Advocates' policy that employees should only be completing modules on their own behalf; any employee who was found to be violating that policy would suffer disciplinary consequences ranging from a discussion with leadership to termination.

Mr. Smith testified that with respect to the Arbitration Module slide titled "Your Agreement," an employee would have to enter their unique PIN number and click "I agree" in order to proceed with the module. *Id*. at 15-16. In other words, the "next" button that would normally appear at the bottom right of a slide would not become available on the "Your Agreement" slide until an employee entered their PIN number and clicked "I agree." This process was the same for the final slides of the Arbitration Module, which required an employee to enter the last four digits of their social security number and subsequently enter an e-mail address in order to click "submit" and advance to the completion slide. *Id*. at 20-21.

With regards to the rollout process for the Arbitration Module, Mr. Smith confirmed that the module was assigned to all employees outside of California in 2015 and the California version was disseminated to California-based employees in 2014. Like other modules, the Arbitration Module would stay in an employee's learning curriculum until it was completed and would only be removed from that employee's learning curriculum once it was successfully completed in its entirety.

Mr. Smith was also questioned about Wireless Advocates' training data tracking systems. He explained that a TTSR can show training completion for a single employee or for all employees. For instance, Exhibit J-6 is an excerpt for a single employee—Mr. Sinclair. *See* TTSR for Paul Sinclair [ECF No. 113-2]. The information set forth in Exhibit J-6 was exported from WAU. As explained by Mr. Smith, at the end of 2016 Wireless Advocates was transitioning from the WAU system to the Litmos system, and therefore Exhibit J-6 is a final record of training completion for important modules extracted from the old system (WAU). Mr. Smith further explained that when the learning system transition occurred, he was responsible for retrieving and storing the WAU records on Wireless Advocates' training drive and he later accessed those historical files when he was contacted by the Human Resources department in connection with this lawsuit.

Mr. Smith also confirmed that the April 20, 2015 Arbitration Module completion date listed for Mr. Sinclair on Exhibit J-6 is accurate. Lastly, as Mr. Regard did, Mr. Smith clarified why column X on Exhibit J-6 displays a completion date of April 20, 2015 even though the module description entry states "Wireless Advocates Policies and Procedures Arbitration Outside of California –**2016**." In Mr. Smith's own words, "column X is for the arbitration agreement regardless of what version. So once Mr. Sinclair completed the arbitration module (or anybody had completed it) if we made an interim update to it, we would update the second header which is basically what you see in row 2. So essentially [Mr. Sinclair] had completed the arbitration

module, we updated it in 2016 but anybody who had completed it prior would still retain it like you see on [Exhibit J-6] and only new employees would complete the 2016 version of it." Therefore, all of the dates in Exhibit J-6 are accurate, and any of the dates that appear in a cell shaded green indicate the date the module was completed by the specific employee per system reporting.[9]

**FINDINGS OF FACT**

Mr. Sinclair was employed by Wireless Advocates as a Kiosk Manager from October 18, 2010 to July 11, 2017. Wireless Advocates is a nationwide third-party provider of wireless products and services. It operates online and in over 600 retail locations nationwide. Since 2014, Wireless Advocates has utilized a dispute resolution procedure for all of its employees. It provides that all disputes arising out of the employment context be resolved by binding arbitration, whether the dispute is brought by Wireless Advocates or the individual employee. The procedure is set forth in Wireless Advocates' mutual binding arbitration agreement titled "Arbitration Policy - Non-California Locations - MUTUAL AGREEMENT TO ARBITRATE CLAIMS" ("Arbitration Agreement").

The Arbitration Agreement is also included in the company's employee handbook, which sets forth policies and procedures that employees must follow as a condition of employment. At all times, the handbook was available to Mr. Sinclair on the WAU system. Wireless Advocates also required its employees to review an Arbitration Module—a PowerPoint-like, multi-slide, electronic learning presentation that each employee had to complete as part of their employment. During the time Mr. Sinclair worked for Wireless Advocates all employees were required to

---

[9] Mr. Smith testified about other TTSRs presented by counsel during the bench trial. Because Mr. Smith's testimony was consistent (both internally and when compared to Mr. Regard's testimony), the Court has summarized only the most crucial and relevant portions of Mr. Smith's testimony.

complete the Arbitration Module. Employees were prompted to use their unique employee identification number in order to access the Wireless Advocates' learning system and complete the Arbitration Module by reviewing and acknowledging their acceptance of the Arbitration Agreement.

Wireless Advocates' records reflect that on or about April 20, 2015, Mr. Sinclair completed the online Arbitration Module when he reviewed the Arbitration Agreement and electronically acknowledged his acceptance of the same by completing the multiple module prompts. Wireless Advocates has no record of Mr. Sinclair disputing the authenticity of his acceptances or signatures on any of Wireless Advocates' employment documents, including those with respect to the Arbitration Agreement, at any time during his employment.

There is similarly no evidence that anyone employed by Wireless Advocates, other than Mr. Sinclair himself, completed the Arbitration Module on Mr. Sinclair's behalf. Thus, the parties voluntarily entered into a written mutual agreement to arbitrate any disputes, as evidenced by Mr. Sinclair's acceptance of the Arbitration Agreement, and his failure to exercise his subsequent opportunities to timely opt-out of the arbitration provision. The Arbitration Agreement is supported by sufficient consideration because it is mutually binding on both Wireless Advocates and Mr. Sinclair. Wireless Advocates has not engaged in any conduct that would constitute a waiver of its rights under the Arbitration Agreement. The Arbitration Agreement agreed to by Mr. Sinclair also contains a class action waiver; therefore, he expressly waived any right to pursue a collective action. Additionally, the claims asserted by Mr. Sinclair in this action fall squarely within the scope of the parties' Arbitration Agreement.

## **CONCLUSIONS OF LAW**

The Federal Arbitration Act ("FAA") governs the Arbitration Agreement. Under the FAA, arbitration agreements are "valid, irrevocable, and enforceable." 9 U.S.C. § 2. Whether an

arbitration agreement exists at all is "simply a matter of contract." *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1346 (11th Cir. 2017). Florida law governs because this action involves an employment relationship in Florida and both parties agree that Florida law controls the question of whether a valid arbitration agreement exists. *See Rodero v. Signal Fin. Co. LLC*, 365 F. Supp. 3d 1263, 1265 (S.D. Fla. 2018) ("As Plaintiffs' FLSA action involves an employment relationship in Florida and the contracts are alleged to have been signed and executed in Florida, Florida law governs whether valid arbitration agreements exist between the parties.") (cleaned up). Although federal courts apply state contract law in determining the existence of an agreement to arbitrate, "federal policy favoring arbitration is taken into consideration even in applying ordinary state law." *Caley v. Gulfstream Aerospace Corp.*, 428 F. 3d 1359, 1368 (11th Cir. 2005).

Under Florida law, "[t]he party seeking enforcement of an agreement has the burden of establishing that an enforceable agreement exists." *CEFCO v. Odom*, 278 So. 3d 347, 352 (Fla. 1st DCA 2019). To prove the existence of a contract under Florida law, the party seeking to enforce the contract must prove by a preponderance of the evidence: "(1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009). If the moving party shows the existence of an agreement, the burden shifts to the party opposing arbitration to "show that no valid contract existed." *Herrera Cedeno v. Morgan Stanley Smith Barney, LLC*, 154 F. Supp. 3d 1318, 1325 (S.D. Fla. 2016). To meet that burden, a non-moving party must "unequivocally deny that an agreement to arbitrate was reached and must offer some evidence to substantiate the denial." *Magnolia Capital Advisors v. Bear Stearns & Co.*, 272 F. App'x 782, 785 (11th Cir. 2008) (citation omitted).

A mere assertion that one does not recall signing a document does not, by itself, create an issue of fact as to whether a signature on a document is valid—especially in the absence of any evidence the document was fabricated. *Gonder v. Dollar Tree Stores, Inc.*, 144 F. Supp. 3d 522,

528 (S.D.N.Y. 2015); *see also Vardanyan v. Close–Up Intern., Inc.*, 315 F. App'x 315, 317 (2d Cir. 2009) (finding no issue of material fact as to the validity of acknowledgement where there was no indication the document was fabricated but the purported signatory claimed not to remember signing the document). Further, class action waivers in employment arbitration agreements must be enforced under the FAA, and neither the FAA's "saving clause nor the NLRA suggest otherwise." *Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1616-20 (2018).

Because the Court finds that Mr. Sinclair completed the Arbitration Module by electronically acknowledging the Arbitration Agreement—thereby reflecting his acceptance to abide by Wireless Advocates' dispute resolution policy—the Court concludes that the parties formed a valid agreement to arbitrate. Mr. Sinclair's arguments against formation have morphed over time. Initially, he argued that there had never been a meeting of the minds, and a contract to arbitrate had not been formed because he never reviewed or accepted the Arbitration Agreement. *See generally* Pl.'s Resp. [ECF No. 36]. However, at the bench trial, his argument seemed to be that he does not remember completing the Arbitration Module—and since the TTSR shows otherwise, it must be that a District Manager took the module for him because "sometimes District Managers have been known to have gone and done stuff like that." But Mr. Sinclair's latest argument strains credulity. He has presented *no* evidence to support a finding that even *one* District Manager in any of Wireless Advocates' *600 locations* has ever completed a training on behalf of any employee.

On the other hand, Wireless Advocates presented, through Mr. Regard's and Mr. Smith's testimony, convincing evidence that its training data tracking system is reliable and accurately reflects Mr. Sinclair's completion of the Arbitration Module on April 20, 2015. Based on the credible evidence presented at the bench trial, the Court finds that Wireless Advocates has proved, by a preponderance of the evidence, the existence of a valid agreement to arbitrate with Mr.

Sinclair. The Court further finds that Mr. Sinclair's speculative testimony does not even begin to scratch the surface of the evidentiary showing a non-moving party must make in order to prove the absence of a valid contract to arbitrate. Thus, given that the Court finds a valid agreement to arbitrate has been entered into between the parties, the claims between Mr. Sinclair and Wireless Advocates must be resolved in arbitration.

## CONCLUSION

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Compel Arbitration and to Stay Proceedings Pending Arbitration [ECF No. 22] is **GRANTED**. The parties shall submit all claims asserted in the Complaint to arbitration in accordance with the Arbitration Agreement.

2. This matter is **STAYED** pending arbitration of Plaintiff's claims. The Clerk of Court is directed to **CLOSE** this matter for administrative purposes.

3. All pending motions are **DENIED AS MOOT**, and any pending deadlines are **TERMINATED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 28th day of February, 2021.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**

cc:   Counsel of record